## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JUSTIN COLLINS                                          CIVIL ACTION

VERSUS                                                  NO.  13-251

N. BURL CAIN, WARDEN                                    SECTION "N"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and the petition **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.      FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Justin Collins, is incarcerated in the Louisiana State Penitentiary

in Angola, Louisiana.[2]  On July 24, 2008, Collins and a co-defendant Marion J. Taylor,

were indicted on a second degree murder charge in the Orleans Parish Criminal District

Court.[3]  The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case

as follows:

> In 2008, Dionne Sparkman ("Ms. Sparkman") accompanied the victim (her brother, Jerome Sparkman) to a car wash.  At approximately 12:15 p.m., the two left the car wash en route to the victim's home, but the victim received a phone call that caused him to instruct Ms. Sparkman to drive to Juanita ("Peewee") Davis' [sic] house.  Justin Collins ("Defendant Collins") was seated on Peewee's porch, and the victim exited the vehicle to speak to Defendant Collins.  Ms. Sparkman could not hear the conversation between the victim and Defendant Collins, but stated that they spoke only briefly before she and the victim entered the house. Shortly thereafter, the victim went back onto the porch.
>
> Ms. Sparkman went onto the porch to call Peewee's daughter to come inside. While on the porch, Ms. Sparkman noticed the victim talking to Defendant Taylor, Defendant Collins, and other friends that she did not recognize.  While Ms. Sparkman recognized Defendant Taylor as one of the victim's friends, she had only seen Defendant Collins for the first time on that day. After Peewee's daughter entered the house, Ms. Sparkman went back into the house.
>
> Ms. Sparkman and the victim remained at Peewee's house for approximately two hours. Approximately ten minutes before he was murdered, the victim entered the house to tell Peewee that someone at the front door wanted to speak to her.  Ms. Sparkman observed that the victim was angry because he loaned Defendant Collins his vehicle (a white Impala) to drive to the store, and Defendant Collins had not yet returned with the vehicle.  The victim spoke to Peewee again briefly and then left the house.
>
> Not long thereafter, someone from the neighborhood came to Peewee's house and stated that the victim had been shot.  Ms. Sparkman panicked when she heard the news and stayed in the house, worrying about how to tell their mother that the victim

---

[2]Rec. Doc. No. 3.

[3]St. Rec. Vol. 1 of 9.

was dead.  A few minutes thereafter, Ms. Sparkman ran from Peewee's house to the intersection of Annunciation and Laurel Streets, where she found the victim dead in the driver's seat of his white Impala.

Ms. Sparkman later spoke to investigating detectives and identified photographs of Defendants Taylor and Collins as the men she last saw with the victim; she also made an in-court identification.

Tawanka Sparkman ("Tawanka") and the victim were married and had four children at the time of the victim's death.  The victim owned a carwash, and on the day of the murder, the victim left their home with his sister, Ms. Sparkman, and drove to his business in Algiers, Louisiana.  On the day of his death, the victim was driving a white Impala.  When the victim left Algiers, he telephoned Tawanka and stated that he and Ms. Sparkman were going to the Tchoupitoulas Street area to see his friend Marion "Little Daddy" Taylor.  Tawanka called the victim thereafter and heard him arguing with someone; he told Tawanka that he would call her back.  When he did so, she asked him if he was okay, and he replied that he was fine.  Tawanka told the victim that she was going home and that she would call him later.  That was the last conversation that Tawanka had with the victim.  Tawanka later received a call from Ms. Sparkman telling her that the victim had been shot.

Tawanka told the investigating detectives that the last time she spoke to the victim, he was with Defendant Taylor.  Tawanka met with Detective Gernon and identified a picture of Defendant Taylor; she also identified Defendant Taylor in court as the man she knew as "Little Daddy."  . . . .

At the time of the incident, Ms. Andrea Taylor was an Assistant Police Communications Supervisor with the NOPD.  Ms. Taylor was responsible for overseeing 911-call operations, and identified State's exhibits twelve and thirteen as the incident recalls and audio recordings, respectively, of the 911 calls received in this case.  One of the 911 calls gives the description of persons running from the scene; the next is someone yelling that someone had been shot; . . . .  All of the calls referenced a white vehicle in the area of Josephine and Laurel Streets.

In accordance with La. R.S. 15:440.1 et seq. ,[4] D.T.1[5] testified that he lived in the neighborhood when the shooting occurred and would walk around the corner to buy candy from a store.  On the date of the incident, D.T.1, his sister, D.T.2, and his cousin walked to the store. While walking, they observed a passing white vehicle containing three people–one person was in the driver's seat, another man was seated

---

[4]"This witness' testimony was taken in the judge's chambers in the presence of both defense counsels, the prosecutors and the judge and simultaneously broadcast via closed circuit television for the jury and the defendants seated in the court room."  [Original opinion footnote].

[5]"Two witnesses are juveniles, and rather than their full names, their initials are used throughout this opinion. However, the initials of both witnesses are 'D.T.', therefore, 'D.T.1,' is used in this opinion for the male juvenile, who was eight-years-old at the time of the incident, and 'D.T.2' is used for his female sister, who was eleven-years-old at the time of the incident."  [Original opinion footnote].

next to him, and another man was in the back seat.  As D.T.1 was entering the store, he observed Defendant Taylor and Defendant Collins each shoot the driver, and he heard two gunshots come from the vehicle.  Thereafter, D.T.1 observed Defendants, who[m] he knew from the neighborhood, exit from the back of the white vehicle and run.  D.T.1 also observed Defendant Collins, who was sitting in the front passenger seat, getting into the back of the vehicle with Defendant Taylor; Defendants then exited the back of the vehicle.

Defendants were armed with black guns when they exited the vehicle.  D.T.1 testified that the gun held by Defendant Collins was "big like an AK machinegun" and the other was "little," like the kind police officers carry.  As D.T.1 ran from the scene, he observed Defendant Collins jump over a black fence; D.T.1 ran home and told his mother what he observed.  D.T.1 spoke to Detectives Gernon and Williams and identified pictures of Defendants as the men he observed exiting the white vehicle.  D.T.1 identified pictures of Defendants Collins and Taylor and the shooting scene.

Detective Nicholas Gernon responded to a call received involving a homicide at Laurel and Josephine Streets and led the investigation of the shooting death of Jerome Sparkman.  When he arrived on the scene, Det. Gernon noted that the area was a residential neighborhood with a corner store and retirement community in close proximity.  A white Impala, with the deceased victim sitting in the driver's seat, had hit a blue truck.  The Impala's driver, front passenger, and left rear doors were open.  Det. Gernon directed police personnel in photographing and collecting evidence from the scene, interviewing the victim's family members and canvassing the neighborhood for potential witnesses.  The police investigation indicated that the shooters were inside the vehicle when the victim was shot.  While inspecting the white Impala, police recovered three cell phones from the vehicle.   The police determined that two of the phones belonged to the victim and the third, a black Boost phone that was found on the floor of the front passenger seat, belonged to Defendant Collins.

Det. Gernon spoke to Christopher Meis ("Mr. Meis"), who Det. Gernon learned was in the store when the shooting began.  Mr. Meis ran outside of the store and saw two suspects fleeing from the white vehicle.  Mr. Meis described the suspect who exited from the front passenger seat as approximately 5'7" tall with light skin complexion and the beginnings of a goatee and a fresh abrasion on his face.  Mr. Meis also described the suspect in the rear driver's side seat as approximately 5'10" tall, lighter skinned than the other suspect, with the beginning of twists in his hair.  However, Mr. Meis could not identify either suspect from a photo lineup compiled by Det. Gernon.

Det. Gernon then spoke to D.T.2, who stated that on her way to the store, she witnessed the shooting and the car accident that ensued.  D.T.2 identified Defendant Collins from a photo lineup as the suspect who was seated in the front passenger seat at the time of the shooting.  Det. Gernon also interviewed D.T.2's younger brother,

4

D.T.1, who accompanied her as she was en route to the store and also identified Defendant Collins as one of the shooters.

Det. Gernon obtained an arrest warrant for Defendant Collins, and Defendant Collins' [sic] mother turned him in to the police. After advising Defendant Collins and his mother of their rights, they agreed to be interviewed by Det. Gernon. Initially, Defendant Collins told Det. Gernon that he and Defendant Taylor were together on the day of the shooting. They went to Defendant Taylor's Aunt Irene's ("Irene") house in the morning and then back and forth to Defendant Taylor's mother's house.

Later that afternoon, they went to Peewee's house, and the victim allowed Defendant Collins to use his vehicle for a trip to the store to buy cigarettes. That afternoon, he learned that the victim had been shot. During further questioning, Defendant Collins admitted that he was in the front passenger seat of the victim's vehicle when the shooting occurred; however, Defendant Collins stated that a person in the back seat shot the victim. Defendant Collins stated that he could not identify the shooter and that he ran from the shooting and stashed his bloody clothing at Irene's house.

The search of Irene's house yielded the recovery of a fully loaded assault rifle from a crawl space in the garage; three boxes of ammunition for the rifle; a box of .45-caliber ammunition; a 9-millimeter handgun, which was stashed underneath the mattress in the master bedroom; 9-millimeter ammunition; and magazines for the weapons. Fingerprint testing on the weapons and ammunition produced negative results. The 9-millimeter gun was registered to Irene and testing excluded it as the murder weapon.

Continuing the investigation, Det. Gernon compiled a photo lineup and presented it to D.T.1 and D.T.2. D.T.1 identified the picture of Defendant Taylor as the man he observed shooting the victim in the head, and D.T.2 recognized the picture of Defendant Taylor as the man she saw seated in the back of the white vehicle, who ran from the scene.

After Det. Gernon retrieved the bullet recovered from the victim's head during autopsy, he searched the victim's vehicle again and located a spent bullet casing under the driver's seat. He also discovered a Sprite can, a T-shirt, hat and water bottle. Testing of the objects revealed no fingerprints on the water bottle, and hair and fiber samples from the other objects were not able to be used. However, the Sprite can contained two fingerprints that were matched to Defendant Collins' [sic] fingerprints. Det. Gernon obtained a search warrant for Defendant Taylor's last known address, and that search produced Defendant Taylor's social security card, birth certificate, paperwork from traffic court, several boxes of shotgun shells and pictures of Defendant Taylor. However, information gleaned from the autopsy indicated that the victim was not killed by a shotgun.

New Orleans Police Department (NOPD) fingerprint analysis expert, Officer Joseph Jackson, analyzed fingerprints taken in the investigation of this case. No

fingerprints were identified as belonging to Defendant Taylor, but one fingerprint tested positive as to Defendant Collins.

Sergeant Byron Winbush, NOPD expert in ballistics and firearms identification, determined that the bullet retrieved during the victim's autopsy was either a .38 caliber or a .357 Magnum caliber.  Because there was no weapon retrieved during the investigation, Sgt. Winbush made his determination by measuring the base diameter of the bullet.  However, when he compared the bullet to the bullet casing retrieved from the scene, he determined that the bullet jacket and the bullet were fired from the same weapon.  Sgt. Winbush concluded that the bullet could not have been fired from a .38 caliber or 9-millimeter weapon.

D.T.2, D.T.1's older sister, lived with her family at the time of this shooting. When walking to the store on the date of the incident, as she turned the corner near the store, she saw Defendant Collins shoot a man seated in the driver's seat of a white vehicle.  In addition to the victim and Defendant Collins, D.T.2 saw Defendant Taylor seated in the back seat of the white vehicle, behind the victim.  After the victim was shot, Defendants Collins and Taylor jumped from the vehicle and ran. D.T.2 observed a gun in Defendant Taylor's hand and a gun in Defendant Collins' [sic] hand.  After the shooting, D.T.2, D.T.1 and Melvin ran toward home. Melvin warned D.T.1 and D.T.2 not to look back, but D.T.2 did.  When D.T.2 arrived home, she told her mother what she had seen.  Later that day, D.T.2 relayed what she had seen to Det. Gernon.  The detective showed her a photo lineup from which she identified Defendant Collins as one of the shooters.  A few days later, from another photo lineup, she identified Defendant Taylor as the other shooter.  When D.T.2 initially spoke to the [sic] Det. Gernon, she told him that Defendant Taylor shot the victim because she was afraid of Defendant Collins.  Later, however, she stated that both Defendants Collins and Taylor shot the victim.

\* \* \*

During his testimony, Mr. Meis also explained that in 2008, he was a member of the Guardian Angels, a volunteer crime fighting organization.  Mr. Meis exited the store when he heard a shot and a crash, and he noticed a white vehicle pushing a blue truck through the intersection.  Mr. Meis saw children running and two men exit the vehicle and run down Laurel Street toward Jackson Avenue.  He did not notice whether either man was armed when exiting the vehicle.  Mr. Meis observed the victim in the vehicle, and, after determining that he needed medical assistance, Mr. Meis called 911.

State v. Collins, 65 So. 3d 271, 275-79 (La. App. 4th Cir. 2011) (footnotes original); St.

Rec. Vol. 3 of 9.

On May 5, 2009, the trial court conducted a hearing and denied Collins's motions to suppress evidence, statements and identification.[6]  On July 14, 2009, the trial court denied co-defendant Taylor's motion to sever the trials of the co-defendants.[7]

On August 25, 2009, the date trial commenced, the State filed a motion that the testimony of D.T.1, a child witness, be taken in a room other than the courtroom and be televised by closed circuit.[8]  The trial court denied the State's motion and the State filed a writ application with the Louisiana Fourth Circuit Court of Appeal.[9]  On that same date, the Louisiana Fourth Circuit granted the State's writ application, determining that the trial court erred in denying the State's motion as untimely.  The state appellate court ordered the trial court to conduct a hearing and make a determination "of whether the protected person's testimony can be taken outside of the courtroom."[10]

The trial court conducted the hearing in which a psychiatrist, Dr. Sarah Deland, testified that it would cause D.T.1 "extreme emotional distress" to testify in open court.[11]  An affidavit from Drs. Richoux and Salcedo was offered into evidence.  The doctors

---

[6]St. Rec. Vol. 4 of 9; Docket Master, p. 2.

[7]Id.  Docket Master, p. 3.

[8]St. Rec. Vol. 1 of 9, 8/25/09 minute entry.

[9]Id.

[10]State v. Taylor, et al, No. 2009-K-1157 (La. App. 4th Cir. 8/25/09); St. Rec. Vol. 2 of 9.

[11]St. Rec. Vol. 9 of 9, pp. 1763-77.

stated that they had examined D.T.1 and concluded that it would be "extremely traumatic and stressful" if he was forced to "testify [in] a live format in front of a jury."[12]  Based upon this evidence, the trial court found that "the protected person would be likely to suffer serious emotional distress if forced to give testimony in open court."  Accordingly, the court ruled that the State would be allowed "to provide closed-circuit testimony in court to the jury."[13]

On August 28, 2009, the jury found Collins guilty of second degree murder as charged.[14]  On October 16, 2009, Collins was sentenced to life in prison without benefit of probation, parole or suspension of sentence.[15]

On direct appeal, Collins's appointed counsel asserted the following arguments: (1) Collins's confrontation right was violated by the closed-circuit television testimony. (2) Tapes of the 911 calls were improperly admitted into evidence.  (3) Firearms and ammunition unrelated to the murder were improperly admitted into evidence.

---

[12]Id. at p. 1777-78.

[13]Id. at pp. 1779-80.

[14]St. Rec. Vol. 1 of 9; St. Rec. Vol. 4 of 9, docket master, p. 5.

[15]St. Rec. Vol. 1 of 9, 10/16/09 minute entry; St. Rec. Vol. 4 of 9, docket master, p. 6.

(4) Identification evidence was insufficient to support his conviction.[16]  On May 11,

2011, the Louisiana Fourth Circuit affirmed Collins's conviction and sentence.[17]

On June 3, 2011, Collins filed a pro se motion in the Louisiana Supreme Court for

extension of time to "supplement the writ of certiorari filed by the Louisiana Appellate

Project . . . ."[18]  Collins's pleading was docketed as Case No. 2011-KO-1185.  In a

June 7, 2011, letter to Collins and his counsel, the Louisiana Supreme Court Clerk of

Court advised "that the pleadings" in Case No. 2011-KO-1185, had been filed on June 7,

2011, and metered on June 3, 2011.[19]  On June 13, 2011, when counsel's writ application

was hand delivered to the Louisiana Supreme Court, the pleading was treated as a

"Supplement" in Case No. 2011-KO-1185.[20]   In the supplement, Collins's counsel

asserted the same claims raised before the Louisiana Fourth Circuit.  On November 23,

2011, the Louisiana Supreme Court denied Collins's writ application without opinion.[21]

---

[16]St. Rec. Vol. 3 of 9, Brief of Appellant, State v. Collins, No. 2010-KA-0757, 07/07/10.

[17]State v. Collins, 2010-KA-0757, 65 So.3d 271 (La. App. 4th Cir. 05/11/11); St. Rec. Vol. 3 of 9.

[18]St. Rec. Vol. 9 of 9.

[19]St. Rec. Vol. 3 of 9.

[20]St. Rec. Vol. 9 of 9.  Collins did not file a pro se writ application with the Louisiana Supreme Court.

[21]State v. Collins, 76 So.3d 1153 (La. 2011).  St. Rec. Vol. 5 of 9, Supreme Court Opinion, 2011-KO-1185, 11/23/11.

Collins's conviction became final 90 days later, on February 22, 2012, when he did not file a writ application with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003) (citing 28 U.S.C. § 2244(d)(1)(A); Flanagan v. Johnson, 154 F.3d 196, 200-01 (5th Cir. 1998)); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (citing 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. R. 13(1).

II.   FEDERAL HABEAS PETITION

On February 13, 2013, the clerk of this court filed Collins's petition for federal habeas corpus relief in which he asserts the following grounds for relief:  (1) His confrontation right was violated by the closed-circuit video testimony.  (2) His confrontation right was violated by admission of the 911 tapes.  (3) Firearms and ammunition unrelated to the murder were improperly admitted into evidence.  (4) The cumulative effect of these errors violated his right to due process.[22]  The State filed a response in opposition to Collins's petition, in which it does not contest that Collins has exhausted his state court remedies, but argues that his petition is untimely.[23]

---

[22]Rec. Doc. No. 3.

[23]Rec. Doc. No. 11.

III.   <u>GENERAL STANDARDS OF REVIEW</u>

The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[24] and applies to habeas petitions filed after that date.  <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir. 1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Collins's petition, which, for reasons discussed below, is deemed filed in this federal court no later than February 7, 2013.[25]

The threshold questions in habeas review under the AEDPA are whether the petition is timely and whether the claims were adjudicated on the merits in state court; <u>i.e.</u>, the petitioner must have exhausted state court remedies and must not be in

---

[24]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir. 1992).

[25]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. <u>Coleman v. Johnson</u>, 184 F.3d 398, 401 (5th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1057 (2000); <u>Spotville v. Cain</u>, 149 F.3d 374, 378 (5th Cir. 1998); <u>Cooper v. Brookshire</u>, 70 F.3d 377, 379 (5th Cir. 1995).  Collins failed to date <u>any</u> of his initial submissions to the court, which I would ordinarily consider the earliest date on which he could have delivered his pleadings to prison officials for mailing to this court.  Collins's petition was filed by the clerk of court on February 13, 2012, when his motion to proceed in forma pauperis was granted. Collins's petition was tendered for filing on February 7, 2013.  The fact that he did not pay his filing fee and therefore, his pleading was not filed by this court until he had been granted pauper status, does not alter the application of the mailbox rule to his pro se petition.  <u>See</u> <u>Cousin v. Lensing</u>, 310 F.3d 843 (5th Cir. 2002) (mailbox rule applies even if filing fee did not accompany initial filing) (citing <u>Spotville</u>, 149 F.3d at 374).

"procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  The State does not contest, and I find, that Collins has exhausted his state court remedies.  The State alleges that Collins's petition is not timely filed.  For the following reasons, I cannot accept the State's time bar defense.

IV.   STATUTE OF LIMITATIONS

The AEDPA requires a petitioner to bring his Section 2254 petition within one year of the date his conviction became final.[26]  Duncan v. Walker, 533 U.S. 167, 179-80 (2001).  The State contends that Collins's petition became final on June 10, 2011, because he did not seek rehearing or file for timely review in the Louisiana Supreme

---

[26]The statute of limitations provision of the AEDPA provides:
(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;
C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.
28 U.S.C. § 2244(d).

Court.[27]  <u>Butler v. Cain</u>, 533 F.3d 314 (5th Cir. 2008) (citing <u>Roberts v. Cockrell</u>, 319

F.3d 690, 694-95 (5th Cir. 2003) (an appeal is final when the state defendant does not

timely proceed to the next available step in an appeal process)).  The State's contention

is based upon the fact that Collins's supplemental writ application was hand-delivered

by counsel on June 13, 2011, three days past the due date.  However, as noted above, on

June 3, 2011, Collins sought an extension of time to file a supplement to his counsel's

writ application.  The Louisiana Supreme Court implicitly granted the extension when

it treated the writ application received on June 13, 2011, as a supplement.  There is no

indication in the record that the Louisiana Supreme Court considered Collins's writ

application untimely.

Accordingly, I find that Collins's writ application to the Louisiana Supreme Court

tolled the one-year AEDPA statute of limitations.  Thus, the prescriptive period  did not

begin to run until February 22, 2012, when Collins did not file a petition for certiorari in

the United States Supreme Court, 90 days after the Louisiana Supreme Court denied his

writ application.  Because Collins filed the instant action under the mailbox rule on or

about February 7, 2012, within his one-year statute of limitations, the instant action is

timely.  Accordingly, I will address the merits of Collins's claims.

---

[27]Under La. S. Ct. R. X § 5, Collins had 30 days from May 11, 2011, when the state appellate court issued its opinion, to mail or file a timely writ application in the Louisiana Supreme Court.  <u>See also</u>, La. Code Crim. P. art. 922.

V.      STANDARDS OF MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)).   The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir. 2000)), aff'd in part, rev'd in part on  other grounds, 532 U.S. 782 (2001); Hill, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

14

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000); accord Penry, 532 U.S. at 792-

93; Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002); Bell v. Cone, 535 U.S. 685, 699

(2002)) (brackets in original).  Rather, under the "unreasonable application" standard,

"the only question for a federal habeas court is whether the state court's determination

is objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002).  The

burden is on the petitioner to show that the state court applied the precedent to the facts

of his case in an objectively unreasonable manner.  Price, 538 U.S. at 641 (quoting

Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

## VI.     CLOSED-CIRCUIT VIDEO TESTIMONY (CLAIM NO. 1)

Collins contends that his right to confront witnesses against him was violated

when the trial court allowed a ten-year old witness, D.T.1, to testify by closed-circuit

television.  Collins argues that the expert evidence submitted as to D.T.1's emotional

15

stress level and the cause for the stress did not satisfy the requirements of Maryland v. Craig, 497 U.S. 836 (1990), and therefore did not overcome his right to confront D.T.1 personally.

The Confrontation Clause of the Sixth Amendment states:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004); see generally Bullcoming v. New Mexico, 131 S. Ct. 2705, 2713 (2011) (testimony of expert who neither participated in nor observed testing or examination, rather than of expert who actually performed testing or examination, violated defendant's right of confrontation); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009) (expert report is "functionally identical" to testimonial statement and, therefore, not admissible when expert does not appear at trial and defendant has not had prior opportunity for cross-examination).

Whether a defendant's confrontation right was violated is a mixed question of law and fact.  Fratta v. Quarterman, 536 F.3d 485, 499 (5th Cir. 2008);  Horn v. Quarterman, 508 F.3d 306, 312 (5th Cir. 2007).  Because Collins's Confrontation Clause claim was adjudicated on the merits by the state court, this federal court is "prohibited from

granting habeas relief unless the state court's decision (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Buckenberger v. Cain, 471 F. App'x 405, 406 (5th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(1)) (citing Fratta, 536 F.3d at 499).

It is well established that a defendant's right to present a defense is not unlimited. United States v. Al Kassar, 660 F.3d 108, 122-23 (2d Cir. 2011), cert. denied, 132 S.Ct. 2374 (2012) (citing Clark v. Arizona, 548 U.S. 735, 769 (2006); Taylor v. Illinois, 484 U.S. 400, 408 (1988); Chambers v. Mississippi, 410 U.S. 284, 302 (1973)); Jimenez v. Walker, 458 F.3d 130, 147 (2d Cir. 2006); United States v. Whittington, 783 F.2d 1210, 1218 (5th Cir. 1986).  The United States Supreme Court has stated that "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  Chambers, 410 U.S. at 294; accord Coy v. Iowa, 487 U.S. 1012, 1020-21 (1988) (citing Chambers, 410 U.S. at 295; Ohio v. Roberts, 448 U.S. 56, 63-65 (1980); Kentucky v. Stincer, 482 U.S. 730, 736 (1987)). Thus, "the Confrontation Clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Pennsylvania v. Ritchie, 480 U.S. 39, 53

17

(1987) (quoting <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985)); <u>accord</u> <u>United States v.</u>

<u>Wilcox</u>, 631 F.3d 740, 750 (5th Cir. 2011); <u>Brown v. Dretke</u>, 419 F.3d 365, 375 (5th Cir.

2005).

In <u>Craig</u>, the Supreme Court again recognized that a defendant's right to confront

witnesses is not absolute, but may be subject to some limitations in order to serve other

important, particularized interests, such as the state's interest in protecting child

witnesses from trauma.  The Court stated:

> [W]e hold that, if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the <u>trauma</u> of testifying <u>in a child abuse case</u> is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.
>       The requisite finding of necessity must of course be <u>a case-specific one</u>:  The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify.  The trial court must also find that the child witness <u>would be traumatized, not by the courtroom generally, but by the presence of the defendant</u>.  Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma <u>unless it is the presence of the defendant that causes the trauma</u>.  In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present.  Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than <u>de minimis</u>, <u>i.e.</u>, <u>more than mere nervousness or excitement or some reluctance to testify</u> . . . .

<u>Craig</u>, 497 U.S. at 855-56 (quotation and citations omitted) (emphasis added).

In the instant case, D.T.1 was a non-victim witness to a murder who testified by one-way closed-circuit television.  My research has located no decisions by a federal habeas court that have addressed a Sixth Amendment challenge under a similar factual scenario.  Craig involved the constitutionality of one-way closed-circuit testimony by the named victim of child abuse and sexual offenses and by three other child witnesses who, although not named in the criminal charges, were also allegedly victims of abuse by defendant.  However, the constitutional principles enunciated by the Craig Court are not strictly limited to those facts.  Horn, 508 F.3d at 319.

In Horn, the Fifth Circuit applied the Craig standards to a habeas petitioner's Confrontation Clause challenge to a state trial court's decision to allow a terminally ill, adult, non-victim witness located in Ohio to testify by two-way closed-circuit television in a murder case in Texas.  After an evidentiary hearing, the trial court determined that the witness, Birk, was too sick to travel to Texas without seriously endangering his health and that the State had demonstrated "a particularized need" for him to testify by closed-circuit television.  Id. at 315.  Birk's trial testimony was taken under oath, with the cameras and video screens positioned so that the court, defendant and jury could see the witness and the witness could see the court, defendant and jury.  A prosecuting attorney and defendant's counsel were present in Ohio with Birk, where defendant's attorney cross-examined the witness.  Id. at 313.

19

The Fifth Circuit in <u>Horn</u> first held that

> [t]he Supreme Court has not considered the use of **two-way** closed-circuit television in relation to the Sixth Amendment, nor has it ruled in a case that was materially indistinguishable from Horn's.  Thus, the state court decision Horn challenges was not contrary to clearly established federal law because it did <u>not</u> apply a rule contradictory to applicable Supreme Court precedent; and it did <u>not</u> reach a result, under materially indistinguishable facts, in conflict with such precedent.

<u>Id.</u> at 312 (quotations and citation omitted) (bold emphasis added; underlined emphasis in original); <u>see also</u> <u>Fuster-Escalona v. Fla. Dep't of Corr.</u>, 170 F. App'x 627, 629 (11th Cir. 2006) (state trial court's decision to allow child victims of sexual abuse to testify by <u>two-way</u> closed-circuit television, without having made case-specific findings regarding trauma each child would suffer by testifying in defendant's presence, was not contrary to clearly established federal law because it did not apply a rule contradictory to applicable Supreme Court precedent; distinguishing <u>Craig</u> because the Supreme Court had addressed the use of <u>one-way</u> closed-circuit television).

The same conclusion as in <u>Horn</u> is mandated in the instant case under the first standard for reviewing the instant mixed question of law and fact.  The Supreme Court has <u>not</u> considered a Confrontation Clause challenge to the use of one-way closed-circuit television for the testimony of a <u>non-victim, child witness</u> in a <u>murder</u> case, and the state court's decision in this case is <u>not</u> materially indistinguishable from <u>Craig</u> or any other Supreme Court decision for that reason.  Thus, the decision that Collins challenges was

not contrary to clearly established federal law because it did <u>not</u> apply a rule contradictory to applicable Supreme Court precedent and it did not reach a result, under materially indistinguishable facts, in conflict with such precedent.

The Fifth Circuit in <u>Horn</u> next considered whether the state court's decision constituted an unreasonable application of Supreme Court precedent to the facts of the case.  Under this second standard for reviewing a mixed question of law and fact, the Fifth Circuit extended the principles of <u>Craig</u> to the two-way closed-circuit testimony of the terminally ill, adult, non-victim witness in the Texas state court murder trial.  The Fifth Circuit emphasized that the Supreme Court had "rejected the view that the Sixth Amendment uniformly demands in-person, face-to-face confrontation" and had held "'that the Confrontation Clause reflects a <u>preference</u> for face-to-face confrontation at trial, . . . a preference that must occasionally give way to considerations of public policy and the necessities of the case.'"  <u>Horn</u>, 508 F.3d at 316-17 (quoting <u>Craig</u>, 497 U.S. at 849) (internal quotations omitted) (emphasis by the Supreme Court).

The Fifth Circuit held that, "given the trial court's efforts to confirm Birk's illness and inability to travel and the care with which the other aspects of Horn's confrontation rights were preserved, we cannot say that the decision to permit Birk to testify via two-way closed-circuit television constituted an unreasonable application of established federal law." <u>Id.</u> at 317.  The "other aspects of Horn's confrontation rights" that the state

court took care to preserve were the same ones that the <u>Craig</u> Court found "significant" because they "adequately ensure[ ] that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." <u>Craig</u>, 497 U.S. at 851.

> [T]he closed-circuit television procedure used for Birk's testimony preserved all of the characteristics of in-court testimony: the trial court administered an oath to Birk under the laws of the state of Texas; he was subject to full cross-examination; and he testified in full view of the defendant, jury, court, and defense counsel. In fact, members of both the defense and prosecution teams sat with Birk in Ohio while he testified.

<u>Horn</u>, 508 F.3d at 317-18 (quotations omitted). Thus, "the state court records reflect that a case-specific finding of necessity was made, and that care was taken to preserve other aspects of Horn's confrontation right." <u>Id.</u> at 318. The Fifth Circuit concluded that it "cannot say that the [trial court's] determination that it was constitutionally sound to permit Birk to testify by way of the two-way television system constituted an unreasonable application of clearly established federal law as determined by the Supreme Court." <u>Id.</u>

The Fifth Circuit expressly rejected Horn's argument that

> <u>Craig</u> and other cases involving child victims of sexual abuse fall into a unique category where courts sought to protect abused young children from further trauma, and that <u>Craig</u>'s reasoning may not be extended to protect other interests. We conclude that it was not unreasonable for the state trial court and the [Texas Court of Criminal Appeals] to disagree. <u>Craig</u>'s <u>references to "an important public policy" and "an important state interest,"</u> <u>are reasonably read to suggest a general rule not limited to protecting child</u> <u>victims of sexual offenses from the trauma of testifying in a defendant's</u>

22

presence. Rather, it is possible to view <u>Craig</u> as allowing a necessity-based exception for face-to-face, in-courtroom confrontation where the witness's inability to testify invokes the state's interest in protecting the witness–from trauma in child sexual abuse cases or, as here, from physical danger or suffering. . . . In light of <u>Craig</u>, we hold that the state court's conclusion that it was constitutionally sound for Birk to testify via two-way closed-circuit television was not an unreasonable application of clearly established federal law as determined by the Supreme Court.

<u>Id.</u> at 319-20 (quoting <u>Craig</u>, 497 U.S. at 850, 852); <u>see also</u> <u>People v. Wrotten</u>, 923 N.E.2d 1099, 1103 (N.Y. 2009) (<u>Craig</u> does <u>not</u> "suggest that it is limited to child witnesses or that a 'public policy' basis for finding necessity must be codified. . . . [T]he public policy of justly resolving criminal cases while at the same time protecting the well-being of a[n adult] witness can require live two-way video testimony in the rare case where a key witness cannot physically travel to court in New York and where, as here, defendant's confrontation rights have been minimally impaired.").

"<u>Craig</u> stands for the proposition that a criminal defendant's Sixth Amendment right to confrontation before the trier of fact is outweighed in some cases by a compelling important state interest <u>comparable to the State's interest in protecting the victims of</u> <u>child abuse</u> from further injury." <u>Brumley v. Wingard</u>, 269 F.3d 629, 644 (6th Cir. 2001) (emphasis added). "[T]he clear import of that decision [is] that deviation from the Confrontation Clause is justified only where there is both a sufficiently important state interest <u>and</u> a showing that the evidence is sufficiently reliable." <u>Id.</u> at n.9.

In Danner v. Motley, 448 F.3d 372 (6th Cir. 2006), the Sixth Circuit applied the Craig standards to a somewhat different factual situation than in the Supreme Court case. The Sixth Circuit found no constitutional violation in a Kentucky trial court's determination that a 15-year-old victim who had been sexually abused between ages five and ten could testify against her abuser by one-way closed-circuit television, even though she was older than the maximum 12 years of age in the Kentucky statute that allowed the procedure. After interviewing the victim in camera, the trial court found that a compelling need existed for the closed-circuit testimony, stating "that due to the nature of the testimony and the age of the witness that face-to-face arrangement would inhibit the witness to a degree that the jury's search for the truth would be clouded. . . . So the compelling need is . . . the need to be able to disclose the testimony so that the jury itself can determine whether they want to accept or reject same or what weight should be given." Id. at 374-75.

The Sixth Circuit found that "fear and trauma associated with a child's testimony in front of the defendant . . . may so overwhelm the child as to prevent the possibility of effective testimony, thereby undermining the truth-finding function of the trial itself" and that "[e]mpirical studies in the social science literature amply support the idea that the presence of the defendant may decrease the accuracy of a child's testimony." Id. at 377 (citing Coy, 487 U.S. at 1031-32 (Blackmun, J., dissenting); State v. Bonello, 554 A.2d 277, 280 (Conn. 1989); State v. Sheppard, 484 A.2d 1330, 1344 (N.J. Super. Ct. Law

Div. 1984); Dorothy F. Marsil et al., <u>Child Witness Policy: Law Interfacing With Social Science</u>, 65 Law & Contemp. Probs. 209, 209 (2002)).

The Sixth Circuit explained that the trial court's rationale was not to further the state's interest in avoiding psychological trauma to the witness, which was the explicit policy basis for the Supreme Court's ruling in <u>Craig</u>. Rather, the rationale was to further the state's secondary interest in eliciting truthful and reliable testimony. The Sixth Circuit noted that the Supreme Court had also recognized that "'there is evidence that [face-to-face] confrontation would in fact <u>disserve</u> the Confrontation Clause's truth-seeking goal," <u>id.</u> at 379 (quoting <u>Craig,</u> 497 U.S. at 857) (emphasis by the Supreme Court), which makes the government's interest in truth-seeking "a potentially valid basis for child witness protection statutes." <u>Id.</u> The Sixth Circuit held that, "[b]ecause the interest in providing reliable testimony is a result of the same fear and trauma that give rise to the state's interest in protecting the witness from psychological injury, and because the state's interest in reliable testimony is an important one, the [state] court's reliance on that interest does not constitute constitutional error so long as the court made the case-specific factual findings required by <u>Craig</u>." <u>Id.</u> Thus, the Sixth Circuit in <u>Danner</u> extended <u>Craig</u> beyond both its facts and its explicit policy basis to find that the Confrontation Clause is not violated when other important state interests are identified and the other safeguards of <u>Craig</u> are followed.

25

My research has located no decisions by a federal habeas court that apply <u>Craig</u> to Sixth Amendment challenges to <u>one-way</u> closed-circuit testimony of a child witness in a <u>murder</u> case. One federal habeas court upheld the constitutionality of <u>two-way</u> closed-circuit testimony of a child witness in a murder case, based on <u>Craig</u> and the evidence of psychological harm to the child if he were compelled to testify in the physical presence of the defendant who had killed his mother and threatened him. <u>Stukes v. Lawler</u>, No. 4:10-CV-24, 2011 WL 1988375, at *12 (M.D. Pa. Apr. 19, 2011), <u>report & recommendation adopted</u>, 2011 WL 1989795 (M.D. Pa. May 23, 2011).

Another federal district court applied <u>Craig</u> in a pending mail and wire fraud prosecution and held that trial testimony by two-way videoconference of six elderly fraud victims located in other states "whose extremely poor physical condition make[s] them unavailable to testify" in person did not violate defendants' right of confrontation. <u>United States v. Sapse</u>, No. 10-CR-00370-KJD, 2012 WL 5334630, at *1 (D. Nev. Oct. 26, 2012). Important considerations sufficient to override the right to face-to-face confrontation were that the two-way videoconference would allow the jury to observe the demeanor of the witnesses, defendants could have a representative in the room with each victim while he or she testified, the importance of the public policy interest in allowing the government to pursue the criminal charges where the victims had been targeted because of their age and infirmities, the evidence that the witnesses "are unavailable due to their extreme, not day-to-day or ordinary, health problems," <u>id.</u> at *2,

and that "'all other elements of the confrontation right'" identified by <u>Craig</u> were preserved.  <u>Id.</u> at *3 (quoting <u>Craig</u>, 497 U.S. at 851).

Although my research has located no federal habeas decisions directly on point, several state appellate courts have applied <u>Craig</u> and found no Confrontation Clause violations in allowing one-way (or virtually one-way) closed-circuit testimony of a non-victim child witness in a murder case.  A California Court of Appeal upheld the trial court's decision, made after an evidentiary hearing, to allow a seven-year-old witness to the murder of her brother to testify in a separate room by two-way closed-circuit television, where she could view a monitor that showed everyone in the courtroom <u>except</u> defendant.  <u>People v. Lujan</u>, 150 Cal. Rptr. 3d 727, 1503 (Cal. Ct. App. 2013).  The court rejected defendant's argument "that <u>Craig</u> marks the outer boundary of when remote testimony is acceptable under the Confrontation Clause. . . .  At no point in the <u>Craig</u> opinion, however, did the Supreme Court indicate that it was staking out the perimeter of when the Confrontation Clause permits remote testimony."  <u>Id.</u> at 1505.

The California Court of Appeal found that the constitutionality of the "remote testimony turns on whether the State has an important public policy interest in protecting <u>minor witnesses who are not victims</u> from the trauma of facing in court the perpetrators of the crimes they witnessed."  <u>Id.</u> (emphasis added).  The court concluded that such an interest existed in the case on appeal.

First, the Court in <u>Craig</u> recognized (or, at a minimum, strongly hinted) that the State's compelling interest in protecting child witnesses from trauma reaches <u>all</u> child witnesses–not just the subset who are charged as victims.  To be sure, <u>Craig</u> cited the State's interest in "'the protection of minor victims of sex crimes from further trauma and embarrassment. . . .'"  But this was the interest directly implicated by the Maryland statute under review in <u>Craig</u>.  Significantly, the Court stated that this narrower interest was just one aspect of "the State's traditional and '"transcendent interest in protecting the welfare of children."'  This broader interest encompasses <u>all</u> child witnesses, victim or not.

Second, there is no principled basis upon which to distinguish the State's interest in protecting child witnesses who are victims from those who are not. . . .

Third, viewing the State's interest in protecting non-victim child witnesses as less important is itself constitutionally suspect.  Lujan urges us to treat children who are not victims of a crime as <u>categorically</u> less traumatized and hence never excused from face-to-face confrontation.  Doing so commits the very sin the Supreme Court condemned in <u>Coy</u>–that is, making a "generalized finding" about the level of trauma certain groups of witnesses experience when confronting defendants.

We hold that child witnesses shown to be traumatized by face-to-face confrontation may testify remotely without violating a defendant[']s Confrontation Clause rights, whether or not those witnesses are victims of an independent crime committed by that defendant.

<u>Id.</u> at 1505-06 (quoting <u>Craig</u>, 497 U.S. at 852, 855; <u>Coy</u>, 487 U.S. at 1020-21).

In another state appellate decision, two children testified via one-way closed-circuit television at the trial in which defendant was convicted of murdering his wife, the childrens' mother.  <u>State v. Cuevas</u>, 776 N.W.2d 302, 2009 WL 3337606, at *8 (Iowa Ct. App. Oct. 7, 2009).  At a pretrial hearing, a psychiatrist testified to the psychological trauma the children had experienced and her belief that they would be traumatized and unable to communicate if they were in the same room as defendant.  <u>Id.</u> at *9.  "The

judge's colloquy with the girls established that they each understood the importance of telling the truth and promised to do so.  Cuevas, through his counsel, vigorously cross-examined each child.  The jury had a full opportunity to observe the girls' demeanor because the jury viewed their testimony, live, over closed-circuit television."  Id. at *9 n.2.  The court of appeals found that all the protections of the Confrontation Clause were present and that the childrens' status as non-victim witnesses did not render the decision unconstitutional.  "In our review of this issue, we have considered that the children were not the direct victims of the offense for which Cuevas was on trial and that the children's testimony was relevant to Cuevas's defense of alibi.  We conclude the trial court did not err in finding the 'exceptional procedure' warranted" and the requirements of Craig satisfied.  Id. at *9, 10; see also Gaitan v. State, 257 S.W.3d 1, 5 (Tex. Ct. App. 2008) (citing Craig, 497 U.S. at 855-56) (additional citations omitted) (Constitutional requirements were satisfied to use closed-circuit television for the testimony of a child witness who saw defendant murder his mother.  "The evidence establishes that [the child] X.P. . . . would suffer undue psychological or physical harm through his involvement at the trial. . . .  [T]he trial court made a case-specific determination that the use of closed-circuit television to present X.P.'s testimony was necessary to protect X.P.'s welfare, that X.P. would be traumatized by being forced to testify in Gaitan's presence, and that the emotional distress that X.P. would suffer if forced to testify in Gaitan's presence would be more than de minimis and more than mere nervousness, excitement, or some

29

reluctance to testify. . . .  Thus, we hold that the State met its burden and that the trial court's decision–especially considering that X.P.'s testimony was presented live via closed-circuit television and that Gaitan had the opportunity to and did cross-examine X.P. at trial–did not violate Gaitan's Confrontation Clause rights.").

In the instant case, the affidavit of Drs. Richoux and Salcedo arguably reflects that it was D.T.1's fear of the courtroom and jury, rather than his fear of Collins and/or co-defendant Taylor, that warranted the State's request that he testify via closed-circuit television.  Drs. Richoux and Salcedo attested:

> We, the undersigned physicians, examined [D.T.1]. Based on our examination, we believe that having him testify in live format in front of a jury would be extremely traumatic and stressful for him. Testimony before the jury would likely exacerbate what appeared to be pre-existing symptoms of a posttraumatic stress disorder.[28]

The testimony of Dr. Deland was more extensive.  Dr. Deland, who spoke with D.T.1 for half an hour on the morning of the hearing,[29] testified:

> My findings were that overall I found [D.T.1] to be a, you know, fairly intelligent child.  He did not present any overt symptom of ongoing mental illness.  However, he was, of course, anxious about his situation.
> He was able to tell me his version of the events that he witnessed very clearly without any difficulty.  However, when it came to talking about coming into open court, he became very, very anxious.  He pretty much completely shut down, started drawing, did not want to talk about it, talked about other things, got up and down out of his chair, asked to leave the room.

---

[28] St. Rec. Vol. 9 of 9, p. 1778 (emphasis added).

[29] Id. at 1771.

And so based upon my - - mainly more my observations than anything he said, it was my opinion that it would cause him extreme emotional distress to come into open court.

Q. And, . . . would he be able to communicate with the Court, to the Court, express what he experienced?

A. . . . I have my doubts about whether or not he would be able to do that.[30]

\*\*\*

Q. And, in your opinion, would part of [his extreme emotional distress] be because he was placed in the same room with the defendants?

A. I'm sure that has - - yes. That has something to do with it. He is scared.[31]

Applying the law enunciated in Craig to the applicable facts, I find that the one-way closed-circuit testimony of D.T.1 did not violate Collins's right to confront D.T.1. Although the holding in Craig was specific to the circumstances of a child victim of abuse testifying against his or her abuser, the key components of the Craig test are findings of trauma caused by the presence of the defendant while the child is testifying. The trauma component was clearly present in this case. All three psychiatrists framed D.T.1's mental state as "more than mere nervousness." Craig, 497 U.S. at 856. The child had witnessed a murder. Two of the psychiatrists described his mental state as exhibiting "pre-existing symptoms of a posttraumatic stress disorder," implying that this pre-existing condition was a result of having witnessed the killing. Although the medical testimony referred to the stress that would result from the ten-year-old's appearance in open court and did not expressly refer to the presence of the defendant as a stressor, it is

---

[30]St. Rec. Vol. 9 of 9, pp. 1770-71.

[31]Id. at 1776.

clearly implicit in the medical opinions that the defendant, the person whom D.T.1 would identify as a killer, would be present in that courtroom, an obvious fact and reality that should not be ignored.  The three doctors' unanimous final conclusions that D.T.1's in-person testimony in open court, where defendant Collins would obviously be present, would cause the child witness "extreme emotional distress" and would be an "extremely traumatic" exacerbation of posttraumatic stress disorder from having witnessed the murder are precisely the kind of "adequate showing of necessity" to permit closed-circuit testimony that the Supreme Court authorized in Craig, 497 U.S. at 855, and that state appellate courts have found constitutional in the cases cited above.  See also People v. Ujaama, 302 P.3d 296, 302 (Colo. App. 2012), cert. denied, 2013 WL 2233872 (Colo. May 20, 2013) (quoting Craig, 497 U.S. at 860) (The use of closed-circuit television for a child witness's testimony in a murder case was constitutional when the trial court did not hold an evidentiary hearing, but accepted the government's offer of proof of trauma, which did not include expert testimony.  The Court in Craig "declined 'to establish, as a matter of federal constitutional law, any . . . categorical evidentiary prerequisites for the use of the one-way television procedure.'  Rather, it held that '[s]o long as a trial court makes . . . a case-specific finding of necessity, the Confrontation Clause does not prohibit . . . using a one-way closed circuit television procedure for the receipt of testimony by a child witness.'").

For all of the foregoing reasons, I conclude that no constitutional error occurred in allowing the 10-year-old D.T.1 to testify by closed-circuit television. However, even if the failure of the doctors specifically (rather than implicitly) to identify the presence of the defendant in the open courtroom as the cause of the child witness's trauma could be characterized as non-compliance with the requirements of Craig, Collins would not be entitled to relief because "Confrontation Clause violations are subject to harmless error analysis." Fratta, 536 F.3d at 507-08 (citing Coy v. Iowa, 487 U.S. 1012, 1021 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); Horn, 508 F.3d at 322 n.24).

The Supreme Court has articulated several factors to assess whether an error is harmless under the Confrontation Clause: "(1) the importance of the witness's testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence of testimony corroborating or contradicting the testimony of the witness on material points, (4) the extent of the cross-examination permitted, and (5) the overall strength of the Government's case." Wilcox, 631 F.3d at 750 (citing Van Arsdall, 475 U.S. at 684).

Weighing these factors in this case militates in favor of a finding of harmless error, if any error is assumed to have been made. D.T.1's closed-circuit testimony reflects that he was an eyewitness to the murder. D.T.1 stated that he was walking down the street with his sister and cousin when they saw three people approaching in a car. He stated that one person in the car was shot and the two others jumped out of the car, each holding a gun. D.T.1 recognized the two who jumped from the car. He had seen them in the

33

"neighborhood."  He knew their names, "Justin and Marion."  He positively identified the two men from photographic lineups.[32]

First, Collins was effectively provided with the right to confront D.T.1, even though the child was not physically present in the courtroom, through the vigorous and contemporaneous cross-examination of D.T.1 conducted by Collins's counsel.[33]

Second, while D.T.1's testimony was clearly significant, it was also merely cumulative.  A second eyewitness, D.T.2, offered essentially the same testimony.  In open court, D.T.2 testified:

> Q.  Now, do you remember something that happened one day when you were going to the store?
> A.  Yeah.
> 
> ***
> 
> Q.  And who were you going to the store with?
> A.  My brother and my cousin.
> Q.  Which brother?
> A.  [D.T.1].
> Q.  Okay.  What was your cousin - - what's your cousin's name?
> A.  Melvin.
> 
> ***
> 
> Q.  Okay.  Now, can you tell the jurors and the judge what happened when you were walking to the store?
> A.  They had shot a man.
> Q.  Okay.  Can you tell them a little bit more?  Can you tell them exactly what you saw?
> A.  Uh-huh.  (Affirmative response.)

---

[32]St. Rec. Vol. 8 of 9, trial transcript at pp. 108-12.

[33]Id., trial transcript at pp. 118-27. In addition to D.T.1's extensive cross-examination by Collins's counsel, he was also cross-examined and recross-examined by counsel for Collins's co-defendant. Id. at pp. 113-18, 128.

Q.  Okay.

A.  I was walking to the store, and I was coming around the corner, and Justin [Collins] had shot the man.

Q.  Okay.  Now you said he shot a man.  Where was the man he shot?

A.  In the passenger seat.

Q.  Okay.  The man was in the passenger seat?

A.  Uh-huh.  (Affirmative response.)

***

Q.  Okay.  And where was the car when you saw it?

A.  Coming up the street.

***

Q.  Okay.  And who did you see in the car?

A.  Justin [Collins], Marion, and the other man.

Q.  Did you know the other man.

A.  No.

***

Q.  Okay.  Now, when you saw Justin [Collins], and Marion, and the man in the car, what did you see happen in the car?

A.  They shot the man.

Q.  Okay.  And when you say, "They shot the man," who did you see shoot the man?

A.  Justin [Collins].

Q.  Okay.  Where was Justin in the car?

A.  Passenger.

Q.  Okay.  He was the passenger?  Can you tell me what part of the car he was in?

A.  On the side of the man.

Q.  Okay.  And where did you see Marion in the car?

A.  At the back seat, at the back of Justin's seat.

Q.  Okay.  And what happened after you saw Justin shoot the man?

A.  They got out and ran.

Q.  Okay.  Now, let's start with Justin.  How did he get out of the car?

A.  He shot the man, then got out . . . .

***

Q.  Okay.  And what did you see him do when he got out of the car?

A.  He ran.

Q.  Okay.  And did you see anything in his hands or on him when he ran?

A.  A gun.

***

35

Q.  Did you see him do anything with the gun?
A.  He shot the man, then he got out the car and ran up the street.
                                          ***
Q.  Okay. Now, [D.T.2], when you saw the people in the car, how did you
know it was Justin and Marion?
A.  When they got out.
Q.  Okay.  And did you know their names then?
A.  Yeah.
Q.  Well, how did you know them?
A.  When I was walking up the street one day and my brother had told me.
Q.  Okay.  And this was before the shooting.
A.  Yeah.[34]

The fact that <u>both</u> D.T.1 and D.T.2 identified the two suspects in a photographic lineup was established at trial via the testimony of Sergeant Nicholas Gernon,[35] who also testified that Collins admitted to being in the car when the murder occurred, but claimed he did not pull the trigger.[36]

Third, the testimony of D.T.2, when coupled with the extensive other evidence introduced at trial by the prosecution, establishes the overall strength of the State's murder case against Collins.

D.T.1's closed-circuit televison testimony was permissible under <u>Craig</u> and its progeny and was <u>not</u> a violation of the Confrontation Clause. Even if it could be characterized somehow as a Confrontation Clause violation, however, the cumulative

---

[34]St. Rec. Vol. 5 of 9, trial transcript at pp. 289-94

[35]<u>See</u> St. Rec. Vol. 8 of 9, trial transcript at pp.  153-54; 157-58.

[36]<u>Id.</u>  at p. 163.

nature of D.T.1's testimony, the availability and actuality of vigorous and contemporaneous cross-examination of D.T.1 via closed-circuit television at trial and the strength of the State's case against Collins establish that any undermining of Collins's right to confront D.T.1 in person was harmless error. Collins is not entitled to relief on this claim.

## VII.   911 TAPES (CLAIM NO. 2)

Collins claims that his right to confrontation was also violated when 911 recordings of witnesses who did not testify at trial were introduced into evidence over defense counsel's objection. Collins asserts that the 911 calls were testimonial and therefore he had the right to confront the callers.

As noted above, the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had (sic) a prior opportunity for cross-examination." Crawford, at 53-54. A Confrontation Clause claim presents a mixed question of law and fact. Fratta, 536 F.3d at 499.

In this case, the 911 telephone calls from witnesses who did not appear at trial consisted of the following:[37] (1) A caller identifying herself as "Tashia" reported that she saw boys running down the street with guns. She stated that they "ran through her

---

[37]Two tape recordings of the 911 calls have been made a part of the state court record and provided to this court for review. Record Doc. No. 14.

auntie's yard." She said that she knew the boys because "they stay around here." She informed the 911 operator that their names were Marion and Justin and that they were both wearing white shirts and jeans. In response, the 911 operator stated that "we will get the police out there." (2) An unidentified woman requested that a police officer and an ambulance were needed because a man had been "shot up." (3) An unidentified woman reported the incident as she was driving near the scene. (4) A woman who refused to identify herself and who said she wanted to speak with the detective on the scene to "give a tip" to the detective. She stated that her "children had seen everything," and she identified the perpetrators as "Justin and Marion." She stated that both perpetrators were wearing blue jeans and white shirts. She further stated that Justin and Marion "went to a house on Philip Street," but she did not know where they were when she placed the 911 call. (5) An unidentified man ranted about all the shootings in the neighborhood.[38]

In <u>Davis v. Washington</u>, 547 U.S. 813 (2006), the Supreme Court addressed whether the admission of a 911 call recording violated defendant's right to confrontation when the caller did not appear at trial. <u>Davis</u> involved a call from a complainant reporting that she was being physically abused by her boyfriend and providing the name of her assailant. After the assailant fled, the complainant provided more details to the

---

[38]There was one other telephone call that is incomprehensible.

911 operator, and police arrived on the scene.  Id. at 817-18.  At trial, the responding officers testified about the complainant's injuries, but they could not identify her assailant.  The complainant did not appear at trial.  Over Davis's objection based on the Confrontation Clause, the trial court admitted the 911 recording identifying Davis as the assailant.[39]

In resolving whether the 911 recording identifying Davis as the assailant was testimonial,[40] the Supreme Court established the following guidelines.  Statements made primarily to enable assistance to meet an "ongoing emergency" are non-testimonial.  Statements made primarily to "prove past events potentially relevant to later criminal prosecution" are testimonial.  Id. at 822 (footnote omitted).[41]  Finding that the primary purpose of the victim's 911 call identifying her assailant "was to enable police assistance to meet an ongoing emergency," the Court found that portion of the call to be non-testimonial and therefore admissible.

_____

[39]Davis was convicted on the charge of "felony violation of a domestic no-contact order."  Id. at 818.

[40]The Court did not resolve whether the complainant's later statements were testimonial because the issue was not before the Court.

[41]These same guidelines, albeit in a different context, were employed in Michigan v. Bryant, 131 S.Ct. 1143 (2011), a decision that Collins cites in support of his argument.  In Bryant, the statements at issue did not arise from 911 calls, but rather from a dying victim's conversation with police regarding who had shot him.  Because the standards are essentially the same, Collins's citation to Bryant is superfluous in the present context.

The Supreme Court specifically limited the scope of its decision in Davis to the first portion of the 911 call, when the victim was seeking police assistance. The Court recognized that statements made for the purpose of attaining emergency assistance may "evolve into testimonial statements once that purpose has been achieved." Davis, 547 U.S. at 828 (quotation and citation omitted). In the context of the Davis facts, the Court explained that once the emergency had ended, i.e., once the assailant had left the scene, the complainant's statements may well have been testimonial. The Court noted that the evolving nature of the 911 conversation had been recognized by the state supreme court. The state court concluded that "even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt." Id. at 829.

In this case, I find that most of the 911 calls reporting the incident and requesting police and/or medical assistance, including especially the 911 call from "Tashia" identifying the perpetrators as Justin and Marion, were non-testimonial. These 911 calls were clearly related to an ongoing emergency. See Martin v. Warden Forcht Wade Corr. Ctr., 289 F. App'x 682, 683 (5th Cir. 2008) (quoting Davis, 547 U.S. at 822) (statements to the 911 operator by a non-testifying attempted manslaughter victim, including her identification of defendant, "were nontestimonial because the circumstances, viewed objectively, indicated that the primary purpose of the interrogation by the 911 operator was 'to enable police assistance to meet an ongoing emergency.'").

40

In contrast, the 911 call placed for the purpose of speaking with the investigating detective to provide him or her with a "tip" was testimonial. This 911 call was placed in an attempt to aid a later criminal prosecution and occurred after the emergency had passed, when police had already arrived and were investigating the murder. Admission of this testimonial evidence, however, constituted harmless error. The identity of the assailants had already been provided by the non-testimonial call from Tashia. The only additional information provided by the woman seeking to give a "tip" to police was a location where the perpetrators had headed immediately after the incident. The caller admitted, however, that she did not know the perpetrators' current location. Adding to the relative insignificance of this sole testimonial call is the fact that the identity of the perpetrators was clearly established at trial via the live testimony of eyewitness D.T.2. As noted above, D.T.2, who knew both Justin Collins and Marion, clearly identified them as the persons who fled the car after shooting the driver.

The state court's admission of the 911 calls did not result in a constitutional violation of the Confrontation Clause rendering Collins's trial fundamentally unfair. The state courts' rejection of the instant claim does not represent an unreasonable application of Supreme Court law to the facts of this case.

## VIII.   FIREARMS AND AMMUNITION (CLAIM NO. 3)

Relying solely upon state law, Collins argues that the trial court erred in admitting guns and ammunition that were unrelated to the murder at issue into evidence.  Collins asserts that the guns and ammunition were irrelevant and introduced to "make him appear to be a scary and dangerous person."[42]

A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."  Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); see also Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law); accord Molo v. Johnson, 207 F.3d 773, 776 n.9 (5th Cir. 2000); Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990); West v. Johnson, 92 F.3d 1385, 1404 (5th Cir. 1996)); see also Hogue v. Johnson, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).  Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.  Estelle, 502 U.S. at 67-68; Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir. 2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir. 1992).

---

[42]Rec. Doc. No. 3, p. 47.

Thus, the states are free to implement procedures regarding the admission and/or exclusion of evidence, provided those procedures do not infringe on a constitutional guarantee.  Burgett v. Texas, 389 U.S. 109, 113-14 (1967); Williams v. Price, 343 F.3d 223, 230 n.3 (3d Cir. 2003); Pemberton v. Collins, 991 F.2d 1218, 1223 (5th Cir. 1993); Nees v. Culbertson, 406 F.2d 621, 625 (5th Cir. 1969); Tillman v. Thaler, No. A-09-CA582-SS, 2010 WL 2731762, at *13 (W.D. Tex. July 9, 2010).  Collins's claim that the trial court erred in admitting into evidence guns and ammunition unrelated to the murder may support federal habeas corpus relief only if the state court evidentiary ruling violates due process in such a way as to render Collins's criminal proceedings fundamentally unfair.  Lisenba v. California, 314 U.S. 219, 236-37 (1941); Gonzales, 643 F.3d at 430; see Peters v. Whitley, 942 F.2d 937, 940 (5th Cir. 1991) (habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right").  Federal habeas corpus relief may be granted on erroneous state evidentiary rulings only if the evidence at issue is "a crucial, critical, or highly significant factor in the context of the entire trial." Thomas v. Lynaugh, 812 F.2d 225, 230 (5th Cir. 1987) (citations omitted); accord Gonzales, 643 F.3d at 430; Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007).

The question of whether evidence is constitutionally admitted or excluded is a mixed question of law and fact.  Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997); Tyson v. Trigg, 883 F.Supp. 1213, 1218 (S.D. Ind. 1994) aff'd, 50 F.3d 436 (7th

Cir. 1995).  Under the applicable standard of review, this court therefore must determine whether the state courts' decisions are contrary to or involve an unreasonable application of Supreme Court precedent.

The evidence at issue was introduced during the testimony of Sergeant Nicholas Gernon.  Gernon testified that he performed a search of 614 Philip Street, a residence belonging to Irene Taylor, Marion Taylor's aunt.[43]  The evidence recovered was a .223 assault rifle, .223 ammunition, .45 caliber ammunition, a 9 millimeter handgun and 9 millimeter ammunition.[44]  Neither the assault rifle nor the handgun were used to commit the murder.[45]  Sergeant Gernon also searched 2125 Annunciation Street, Taylor's last known address.[46]  Only shotgun shells were uncovered at that residence.[47]  A shotgun was not used to murder the victim.[48]

The admission of extrinsic evidence for the purpose of showing a propensity on the part of a defendant to commit a particular crime is generally inadmissible under Louisiana law, although it may be admissible for other purposes.  See La. Code Evid. art.

---

[43]St. Rec. Vol. 8 of 9, trial transcript, pp. 164-65.

[44]Id. at p. 166.

[45]Id. at 167-68.

[46]Id. at p. 176.

[47]Id. p. 182.

[48]Id.

404(B).  However, as noted above, a violation of state law is of no moment for purposes of habeas review.  Habeas review is limited to a determination of whether the admission of the evidence deprived Collins of a fundamentally fair trial.  In this case, it did not. The evidence was not "material" to Collins's murder conviction "in the sense of a crucial, critical, or highly significant factor."  Thomas, 812 F.2d at 230.  The weapons and ammunition were found in residences to which Collins was only peripherally connected.  It was not emphasized at trial and was mentioned solely in the context of providing an overall picture of the police investigation.  The State presented far more powerful evidence of Collins's clear guilt through the testimony of D.T.2, an eyewitness who saw the incident, recognized Collins when he fled the scene, readily picked him out of a six-photographic lineup, and clearly established him as the murderer at trial.  Under these circumstances, Collins's trial was not rendered fundamentally unfair by the admission into evidence of this testimony about other weapons and ammunition.  Collins is not entitled to relief on this claim.

## IX.   CUMULATIVE ERROR (CLAIM NO. 4)

Collins claims that he suffered a constitutional violation when the cumulative effect of the wrongfully admitted evidence, i.e., "the closed circuit testimony, 911 calls and unrelated weaponry" is considered.  Collins cites no law in support of his claim.

Collins has failed to identify any constitutional error with respect to the admission of the closed-circuit testimony or 911 calls or unrelated weaponry, leaving no basis for

any alleged cumulative prejudicial effect of any error.  See Turner v. Quarterman, 481 F.3d 292, 301 (5th Cir. 2007) (citing Derden v. McNeel, 978 F.2d 1453, 1454, 1461 (5th Cir. 1992)) (meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) (with respect to cumulation of meritless claims, "Twenty times zero equals zero.").  Accordingly, Collins has not shown his entitlement to consideration of or relief on the theory of cumulative error arising from the trial court's evidentiary rulings.  He is not entitled to relief on this claim.

## **RECOMMENDATION**

For all of the foregoing reasons, it is **RECOMMENDED** that the petition of Justin Collins for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  See Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[49]

New Orleans, Louisiana, this _____21st_____ day of August, 2013.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[49]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.